ISBRANDTSEN COMPANY, INC. *v.* JOHNSON.

No. 493.   Argued April 23, 1952.—Decided June 9, 1952.

*Mark D. Alspach* argued the cause for petitioner. With him on the brief was *Thomas E. Byrne, Jr.*

*William M. Alper* argued the cause for respondent. With him on the brief were *Abraham E. Freedman* and *Charles Lakatos.*

MR. JUSTICE BURTON delivered the opinion of the Court.

The question before us arises in an admiralty proceeding by a seaman against his employer to recover wages earned on a merchant vessel of United States registry. The question is whether the employer may set off against the seaman's wages its expenditures for the medical care and hospitalization of another member of the crew necessitated by injuries inflicted on him by the seaman, without justification, during the voyage on which the wages were earned. For the reasons hereafter stated we hold that it may not do so.

In 1948, respondent, Johnson, was employed by petitioner, Isbrandtsen Company, Inc., as a messman on a foreign voyage of a vessel of United States registry, chartered by petitioner. On April 21, while the vessel was on its course in the Pacific, Johnson, without justification, stabbed Brandon, another member of the crew. He injured Brandon so severely that petitioner found it necessary to divert its vessel from its course in order to hospitalize Brandon on the Island of Tonga. Johnson makes no claim for wages earned after April 21. However, when discharged in Philadelphia, May 31, 1948, Johnson claimed $439.27 as earned wages due him above all deductions, without making allowance for any expenditures made by petitioner for the care or hospitalization of Brandon. When petitioner refused to pay Johnson anything, he filed a libel and complaint in the United States District Court to recover the balance due on his earned wages, plus interest, transportation to Seattle (his port of signing on) and double wages for each day of unlawful delay in the payment of the sum due.[1] Petitioner set up a counterclaim of $2,500, later reduced to $1,691.55, for

---

[1] Under R. S. § 4529, as amended, 30 Stat. 756, 38 Stat. 1164, 46 U. S. C. § 596. See note 7, *infra*.

expenses and losses caused it by Johnson's attack on Brandon.[2] It contended also that the nature of this defense demonstrated the existence of sufficient statutory cause for its delay in making payment.

The District Court disallowed petitioner's counterclaim and entered judgment for respondent's earned wages and transportation allowance, plus interest and costs. It disallowed respondent's claim for double wages.[3] 91 F. Supp. 872. Petitioner appealed but the Court of Appeals affirmed. 190 F. 2d 991. We granted certiorari because the decision below presents an important question of maritime law not heretofore determined by this Court. 342 U. S. 940.

Petitioner cites several early lower court decisions which allowed a set-off against a seaman's suit for wages. These were largely rendered before the Shipping Commissioners Act of 1872 or rendered later without discussion of that or subsequent legislation.[4] We are convinced, however, that the legislation passed by Congress for the protection of seamen, beginning in 1872, has now covered this field. Petitioner's set-off is not prescribed,

---

[2] The latter sum is the stipulated amount of petitioner's expenditures for hospitalization, medical care, repatriation and subsistence of Brandon, plus petitioner's expenses for the diversion of its vessel to Tonga, including pilotage, manifests, harbor dues, fuel consumed and food for the crew.

[3] See *Collie* v. *Fergusson*, 281 U. S. 52.

[4] For the Shipping Commissioners Act, see 17 Stat. 262 *et seq.*, Tit. LIII, R. S. §§ 4501–4612, 46 U. S. C., c. 18, §§ 541–713. The Act of July 20, 1790, 1 Stat. 131, in effect prior to 1872, was a limited forerunner of the expansive remedial legislation that followed. It did not attempt to cover the field to an extent comparable to that done by the later legislation. Accordingly, decisions rendered before 1872, recognizing an employer's right of recoupment against seamen's wages under general maritime law, are not authoritative guides today. The early cases are reviewed in 1 Norris, The Law of Seamen (1951), 378–391.

recognized or permitted by such legislation. So far as that legislation goes, such a set-off is not available as a defense against a seaman's claim for earned wages. R. S. § 4547, 30 Stat. 756, 46 U. S. C. § 604. On the other hand, the absence of such authorization for the employer to set off such a counterclaim does not preclude it from seeking to collect the claim otherwise.

For the purposes of this case, we may assume that petitioner owed Brandon the legal duty to provide him with the medical care and hospitalization which it provided and also owed him the duty to divert its vessel from its course to secure his hospitalization at Tonga. *Aguilar* v. *Standard Oil Co.,* 318 U. S. 724, 730, 732–736. See *Cortes* v. *Baltimore Insular Line,* 287 U. S. 367, 375; *Alpha S. S. Corp.* v. *Cain,* 281 U. S. 642; *Jamison* v. *Encarnacion,* 281 U. S. 635. Also, we may assume, without deciding, that respondent owed petitioner an obligation to reimburse petitioner for the expense which he thus thrust upon it by his unjustified attack upon a fellow seaman.

Whenever congressional legislation in aid of seamen has been considered here since 1872, this Court has emphasized that such legislation is largely remedial and calls for liberal interpretation in favor of the seamen. The history and scope of the legislation is reviewed in *Aguilar* v. *Standard Oil Co.,* 318 U. S. 724, 727–735, and notes. "Our historic national policy, both legislative and judicial, points the other way [from burdening seamen]. Congress has generally sought to safeguard seamen's rights." *Garrett* v. *Moore-McCormack Co.,* 317 U. S. 239, 246. "[T]he maritime law by inveterate tradition has made the ordinary seaman a member of a favored class. He is a 'ward of the admiralty,' often ignorant and helpless, and so in need of protection against himself as well as others. . . . Discrimination may thus be rational in respect of remedies for wages." *Warner* v. *Goltra,* 293 U. S.

155, 162; *Cortes* v. *Baltimore Insular Line,* 287 U. S. 367, 375, 377; *Wilder* v. *Inter-Island Navigation Co.,* 211 U. S. 239, 246–248; *Patterson* v. *Bark Eudora,* 190 U. S. 169; *Brady* v. *Daly,* 175 U. S. 148, 155–157. "The ancient characterization of seamen as 'wards of admiralty' is even more accurate now than it was formerly." *Robertson* v. *Baldwin,* 165 U. S. 275, 287;[5] *Harden* v. *Gordon,* 11 Fed. Cas. No. 6,047, 2 Mason (Cir. Ct. Rep.) 541, 556.

Statutes which invade the common law or the general maritime law are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident. No rule of construction precludes giving a natural meaning to legislation like this that obviously is of a remedial, beneficial and amendatory character. It should be interpreted so as to effect its purpose. Marine legislation, at least since the Shipping Commissioners Act of June 7, 1872, 17 Stat. 262, should be construed to make effective its design to change the general maritime law so as to improve the lot of seamen. "The rule that statutes in derogation of the common law are to be strictly construed does not require such an adherence to the letter as would defeat an obvious legislative purpose or lessen the scope plainly intended to be given to the measure." *Jamison* v. *Encarnacion,* 281 U. S. 635, 640; *Texas & P. R. Co.* v. *Abilene Cotton Oil Co.,* 204 U. S. 426, 437, 440.

---

[5] That appraisal was reaffirmed in *Cortes* v. *Baltimore Insular Line,* 287 U. S. 367, 377. Current testimony is added by the following statement:

"In my dealings with seamen, a class with whom I come in frequent contact, I find that they are perhaps better educated and better dressed than their fellows of a century ago, but, in general, as improvident and prone to the extremes of trust and suspicion as their forebears who ranged the seas, but withal a likeable lot." 1 Norris, The Law of Seamen (1951), Preface.

The direction of the current of maritime legislation long has been evident on its face.

> "In this country these notions were reflected early, and have since been expanded, in legislation designed to secure the comfort and health of seamen aboard ship, hospitalization at home and care abroad. . . . The legislation . . . gives no ground for making inferences adverse to the seaman or restrictive of his rights. . . . Rather it furnishes the strongest basis for regarding them broadly, when an issue concerning their scope arises, and particularly when it relates to the general character of relief the legislation was intended to secure." *Aguilar* v. *Standard Oil Co.*, 318 U. S. 724, 728–729.

In the specific area of a seaman's right to collect his earned wages promptly upon discharge, § 61 of the Shipping Commissioners Act provided that "no wages due or accruing to any seaman or apprentice shall be subject to attachment or arrestment from any court; . . . ." 17 Stat. 276, R. S. § 4536, 38 Stat. 1169, 46 U. S. C. § 601. The full force of this became evident when this Court, in 1908, interpreted "attachment" and "arrestment" to mean that the Act prohibits the seizure of a seaman's earned wages even by levying execution against them to collect valid judgments. *Wilder* v. *Inter-Island Navigation Co.*, 211 U. S. 239; see 1 Norris, The Law of Seamen (1951), 347–350.

Congressional legislation now touches nearly every phase of a seaman's life. It concerns itself with his personal safety, comfort and health in many ways not necessary to review here. It deals specifically with his shipping articles and the payment to him of his wages. It insures generally a partial payment to him of his wages at each port where his vessel loads or delivers cargo. It

insures the payment to him of the balance of those wages upon completion of his voyage or shortly after his discharge.[6] It deals explicitly with the final payment of wages.[7] It describes "forfeitures" which lawfully may be deducted from a seaman's wages "for the benefit of the

---

[6] In harbors of the United States this applies even to seamen on foreign vessels. R. S. § 4530, 30 Stat. 756, 38 Stat. 1165, 41 Stat. 1006, 46 U. S. C. § 597. Except as expressly provided by statute, no seaman may be paid in advance or may give up to others his personal right to his wages or his remedies for their recovery. 23 Stat. 55–56, 30 Stat. 763–764, 33 Stat. 308, 38 Stat. 1168–1169, 41 Stat. 1006, 53 Stat. 794, 64 Stat. 1081, 1239, 46 U. S. C. § 599, and 46 U. S. C. (Supp. IV) § 599 (b) (g); R. S. § 4535, 46 U. S. C. § 600. His wages are not subject to attachment or arrestment except for limited provisions for the support of a wife or minor children; allotments to relatives are restricted. R. S. § 4536, 17 Stat. 276, 38 Stat. 1169, 46 U. S. C. § 601. Payments in foreign ports are safeguarded through United States Consuls. R. S. §§ 4580, 4581, 4583, 23 Stat. 54–55, 30 Stat. 759, 38 Stat. 1185, 46 U. S. C. §§ 682, 683, 685.

[7] "Sec. 4529. The master or owner of any vessel making coasting voyages shall pay to every seaman his wages within two days after the termination of the agreement under which he was shipped, or at the time such seaman is discharged, whichever first happens; and in case of vessels making foreign voyages, or from a port on the Atlantic to a port on the Pacific, or vice versa, within twenty-four hours after the cargo has been discharged, or within four days after the seaman has been discharged, whichever first happens; and in all cases the seaman shall be entitled to be paid at the time of his discharge on account of wages a sum equal to one-third part of the balance due him. Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable as wages in any claim made before the court; but this section shall not apply to masters or owners of any vessel the seamen of which are entitled to share in the profits of the cruise or voyage." R. S. § 4529, as amended, 38 Stat. 1164–1165, 46 U. S. C. § 596.

master or owner by whom the wages are payable."[8] These provisions for the return of wages to the employer are remedial, rather than penal, in their nature. See Crawford, The Construction of Statutes (1940), 106.

---

[8] "SEC. 4596. Whenever any seaman who has been lawfully engaged or any apprentice to the sea service commits any of the following offenses, he shall be punished as follows:

"First. For desertion, by forfeiture of all or any part of the clothes or effects he leaves on board and of all or any part of the wages or emoluments which he has then earned.

"Second. For neglecting or refusing without reasonable cause to join his vessel or to proceed to sea in his vessel, or for absence without leave at any time within twenty-four hours of the vessel's sailing from any port, either at the commencement or during the progress of the voyage, or for absence at any time without leave and without sufficient reason from his vessel and from his duty, not amounting to desertion, by forfeiture from his wages of not more than two days' pay or sufficient to defray any expenses which shall have been properly incurred in hiring a substitute.

"Third. For quitting the vessel without leave, after her arrival at the port of her delivery and before she is placed in security, by forfeiture from his wages of not more than one month's pay.

"Fourth. For willful disobedience to any lawful command at sea, by being, at the option of the master, placed in irons until such disobedience shall cease, and upon arrival in port by forfeiture from his wages of not more than four days' pay, or, at the discretion of the court, by imprisonment for not more than one month.

"Fifth. For continued willful disobedience to lawful command or continued willful neglect of duty at sea, by being, at the option of the master, placed in irons, on bread and water, with full rations every fifth day, until such disobedience shall cease, and upon arrival in port by forfeiture, for every twenty-four hours' continuance of such disobedience or neglect, of a sum of not more than twelve days' pay, or by imprisonment for not more than three months, at the discretion of the court.

"Sixth. For assaulting any master, mate, pilot, engineer, or staff officer, by imprisonment for not more than two years.

"Seventh. For willfully damaging the vessel, or embezzling or willfully damaging any of the stores or cargo, by forfeiture out of his wages of a sum equal in amount to the loss thereby sustained, and

In keeping with the spirit of such legislation and the need for clear rules governing the computation of the balance due each seaman upon his discharge, it is reasonable to hold that only such deductions and set-offs for derelictions in the performance of his duties shall be allowed against his wages as are recognized in the statutes. Other claims against him may be valid but their collection must be sought through other means.[9]   The appropriateness of this solution is emphasized in the case of unliquidated counterclaims.   Petitioner's unliquidated claim

---

also, at the discretion of the court, by imprisonment for not more than twelve months.

"Eighth. For any act of smuggling for which he is convicted and whereby loss or damage is occasioned to the master or owner, he shall be liable to pay such master or owner such a sum as is sufficient to reimburse the master or owner for such loss or damage, and the whole or any part of his wages may be retained in satisfaction or on account of such liability, and he shall be liable to imprisonment for a period of not more than twelve months."   R. S. § 4596, as amended, 38 Stat. 1166, 53 Stat. 1147, 46 U. S. C. § 701.

Special provision is made for forfeitures incident to desertion. They are to be applied "in the first instance, in payment of the expenses occasioned by such desertion, to the master or owner of the vessel from which the desertion has taken place . . . ."   The balance is to be paid by the master or owner to a government official to be disposed of in the same manner as in the case of a deceased seaman. "In all other cases of forfeiture of wages, the forfeiture shall be for the benefit of the master or owner by whom the wages are payable." R. S. § 4604, 46 U. S. C. § 706.

Certain expenses unjustifiably forced upon his employer by a seaman are expressly made chargeable against his earned wages: Unjustified inspections of seaworthiness of the vessel, R. S. § 4562, 46 U. S. C. § 659; unjustified surveys of provisions and water, R. S. § 4566, as amended, 30 Stat. 758, 46 U. S. C. § 663; part of cost of securing conviction of seaman for offenses committed on the voyage, R. S. § 4605, 46 U. S. C. § 707.

[9] "The above sections [46 U. S. C. §§ 596, 597, 600, 601, 682, 683 and 685] look towards payment to the seaman by his employer, at the termination of the employment, of all of his earned wages, without

was first estimated at $2,500. It now has been fixed at $1,691.55. The factors making up such a claim are largely within the control and knowledge of the employer alone and it easily could wipe out every cent of a seaman's earned wages.

There is little substance to the suggestion that the expenses at issue can be brought within the statutorily recognized "forfeitures." Assuming that Johnson's attack amounted to a breach of general discipline, it hardly amounted to "willful disobedience to any lawful command at sea . . . ." R. S. § 4596, Fourth.[10] Assuming that it caused expense to petitioner, it hardly amounted to "willfully damaging the vessel . . . or . . . any of the stores or cargo . . . ." R. S. § 4596, Seventh.[11]

From this, we conclude that Congress has preempted the area relating to deductions and set-offs based upon derelictions of duty as against a seaman's claim to his

---

any deductions except those which are expressly authorized by statute.

.         .         .         .         .

"While it is the general rule that a seaman discharged in a foreign port is entitled to receive his wages 'without any deduction whatever' of claims against him whether of his employer or of third parties, there are exceptions recognized by the maritime law and now embodied in statutes." *Shilman* v. *United States*, 164 F. 2d 649, 650–651; and see *Chambers* v. *Moore McCormack Lines*, 182 F. 2d 747; *Eldridge* v. *Isbrandtsen Co.*, 89 F. Supp. 718. Cf. *Oldfield* v. *The Arthur P. Fairfield*, 176 F. 2d 429.

[10] See note 8, *supra*.

[11] See note 8, *supra*. Johnson's attack also was not an assault on "any master, mate, pilot, engineer, or staff officer" of the vessel. R. S. § 4596, Sixth, note 8, *supra*. Such an assault may lead to imprisonment of the offender but it entails no "forfeiture." If no "forfeiture" may be set off against a seaman's wages for expenses resulting to his employer from his assault upon a superior officer, there is little basis to imply congressional approval of a set-off against his wages to cover expenses resulting from his assault upon a fellow member of the crew not his superior.

wages. Congress has gone so far in expressly listing such deductions and set-offs that it is a fair inference that those not listed may not be made. It thus remains for the courts to determine only what are the deductions or set-offs for derelictions of duty that are listed by Congress, rather than to determine which of the deductions or set-offs once known to the general maritime law Congress has failed to exclude. Congress, in effect, has excluded all of them except those which it has listed affirmatively.[12]

Accordingly, the judgment is

*Affirmed.*

MR. JUSTICE JACKSON dissents.

---

[12] For comparable reasons, petitioner's counterclaim may not be set off against the allowance made to respondent for transportation to his port of signing on. That allowance is proportionately as important to him and to his welfare as is the balance due him for earned wages.