UNITED STATES of America, Plaintiff,

v.

DIXIE CARRIERS, INC. and Water Quality Insurance Syndicate, in personam and M/V Dixie Buccaneer and T/B ABC 2311, in rem, Defendants.

Civ. A. No. 77–2090.

United States District Court,
E. D. Louisiana.

Oct. 27, 1978.

---

Michael K. Bell, Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., for plaintiff.

Montgomery, Barnett, Brown & Read, Henry J. Read, Machale A. Miller, New Orleans, La., Bigham, Englar, Jones & Houston, New York City, for Water Quality Ins. Syndicate.

Liskow & Lewis, Donald R. Abaunza, Frederick W. Bradley, New Orleans, La., for Dixie Carriers, Inc.

CASSIBRY, District Judge:

In this action, the United States is trying to recover the costs of cleaning up an oil spill. On June 22, 1974, after a mishap involving a tugboat and its tow of loaded tank barges, approximately 1,265,000 gallons of oil spilled into the Mississippi River. Defendant Dixie Carriers, Inc., owner of the tugboat, notified all interested parties and caused cleanup operations to commence. When Dixie had incurred expenses equal to what it contends is its maximum liability under federal law, it discontinued the cleaning operation. The Coast Guard took over by hiring a civilian contractor to finish the job and incurred costs of $954,-403.53 in the operation.

The United States seeks reimbursement for this entire amount. It advances several possible legal bases for its claim: the general maritime law of torts; the federal common law of public nuisance; the Refuse Act, 33 U.S.C. §§ 407, 411 and 412; and the Water Pollution Control Act ("WPCA"), 33 U.S.C. §§ 1251 et seq.

Defendants have filed a motion for partial summary judgment.[1] They contend first that the WPCA is exclusive in its

1. Defendants styled their motion as one for partial summary judgment because there is one question concerning Dixie Carriers' liability that remains unquestionably alive. This concerns whether Dixie Carrier's voluntary payments toward cleaning up the oil spill should be credited against its liability to the government for the government's cleanup costs, whatever that liability may be.

application to the plaintiff's claim, thus foreclosing plaintiff's reliance on any other legal theories. Generally, the WPCA establishes a limited liability for the government's oil spill cleanup costs; only in cases of willful negligence or misconduct is there liability for the full amount expended by the United States. 33 U.S.C. § 1321(f). Defendants also argue in this motion that there has been no such willful misbehavior in this case, but, as this court stated at the hearing on the motion, that issue involves disputed facts and thus is not ripe for summary judgment. The only issue presently before the court is whether the WPCA prevents the United States from seeking reimbursement for the full amount of its oil spill cleanup costs under the alternative legal theories it advances here.

*The language of the WPCA*

The law in effect at the time of the mishap in this case provided that the

[O]wner or operator of any vessel from which oil or a hazardous substance is discharged in violation of subsection (b)(3) of this section shall, *notwithstanding any other provision of law*, be liable to the United States Government for the actual costs incurred . . . for the removal of such oil or substance by the United States Government in an amount not to exceed $100 per gross ton of such vessel or $14,000,000 whichever is lesser, except that where the United States can show . . . willful negligence or willful misconduct . . . , such owner or operator shall be liable to the United States Government for the full amount of such costs.

33 U.S.C. § 1321(f)(1) (emphasis added).

If the phrase "notwithstanding any other provision of law" modifies the language creating *liability* rather than merely that setting the *limitation*, then it would represent an acknowledgement by Congress that there exist other laws upon which the government can base a claim for reimbursement for cleanup expenses. The statute itself is ambiguous. The legislative history of the WPCA is silent on the point.

However, the legislative history of the Water Quality Improvement Act ("WQIA"), P.L. 91–224, 84 Stat. 91 (replaced by the WPCA), the predecessor to the WPCA on this issue, does shed some light on the problem. The "notwithstanding any other provision of law" language was contained in the House bill and was retained by the Conference Committee in the altered version of the House bill that it reported out. Both the House Report and the Conference Report contain the following statement in reference to the oil spill cleanup costs provision set out in the House bill:

This limitation on liability is intended to be the only limitation on liability for discharge of oil or matter under this section, notwithstanding any other provisions of law.

H.R.Rep.No.91–127, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Admin. News, pp. 2691, 2702; Conference Report No. 91–940, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Admin.News, pp. 2712, 2715.

The "notwithstanding any other provision of law" language thus seems designed simply to ensure that no other laws *limit* a polluter's liability for the United States' cleanup costs. It does not resolve the question whether the WPCA allows other laws to serve as the basis of a recovery of a greater amount, *i. e.* the government's total cleanup expenses.

*The legislative scheme of the WPCA*

In the absence of dispositive language in the WPCA, we must next examine the character of the legislative program it establishes, to determine whether the structure and operation of the WPCA's liability scheme either demands or precludes the availability of other legal bases for recovery by the United States.

Under the WPCA, there is full liability for the government's expenses only upon a showing of willful negligence or misconduct. If the defendant's behavior does not reach this level of culpability, its liability is limited. And that limited liability will be imposed unless the defendant can prove

that the discharge of oil or other hazardous substance was caused by a factor completely beyond its control. 33 U.S.C. § 1321(f)(1)–(3). This scheme was first set out in the WQIA, and was the product of considerable legislative debate and effort. The Senate bill provided for full liability in the event of simple negligence. The House bill provided for limited liability in the event of a willful or negligent discharge. See 1970 U.S.Code Cong. & Admin.News, pp. 2712–2728. The provision that became part of the WQIA—and· was carried over into the WPCA—represents a deliberate legislative compromise between these extremes.

The result of that compromise would be destroyed if full liability were available under a lesser standard as part of another legal theory. That is, the WPCA embodies a legislative balancing of interests that makes liability unlimited only in a narrow range of circumstances, but as a tradeoff makes limited liability available in almost every other circumstance. This careful balancing would be in vain if the United States could merely utilize other, more permissive laws whenever it sought to impose liability beyond that which is easily available under the WPCA.

*The WPCA and the Refuse Act*

In opposing this conclusion, the United States argues with special vigor that the WPCA retains the Refuse Act in all its possible applications. The Refuse Act, which was part of the Rivers and Harbors Appropriation Act of 1899, forbids the discharge of any refuse matter into navigable water. 33 U.S.C. § 407. Oil constitutes refuse matter under this provision. *United States v. Standard Oil Co.,* 384 U.S. 224, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966). Although the statute itself provides only criminal penalties, 33 U.S.C. §§ 411, 412, courts have made civil remedies available under it to the United States as plaintiff. *E. g. Wyandotte Transportation Co. v. United States,* 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967). The United States here argues that the WPCA does not prevent its seeking

reimbursement for the costs of cleaning up oil discharged in violation of the Refuse Act. As it points out, the WPCA does expressly retain the Refuse Act while expressly repealing certain other statutes. 33 U.S.C. § 1371. But this retention is not as unqualified as plaintiff argues.

The predecessor WQIA provided that it "shall not be construed as . . . affecting or impairing the provisions of sections 407, 408, 409, and 411 to 413 of this title [Title 33 of the U.S.Code]." P.L. 91–224 § 102, 84 Stat. 91, 113 (formerly 33 U.S.C. § 1174). The WQIA was thus not to affect at all the operation of the Refuse Act. See *United States v. Pennsylvania Industrial Chemical Corp.,* 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973), holding, *inter alia,* that the WQIA provisions directing the states to develop minimum water quality standards did not preclude the prosecution of a person under the Refuse Act for discharging pollutants into navigable water.

The WPCA's retention of the Refuse Act is far less sweeping than that of the WQIA. The WPCA provides that it "shall not be construed as . . . affecting or impairing the authority of the Secretary of the Army . . . under the Act of March 3, 1899 [the Rivers & Harbor Appropriation Act,· which includes the Refuse Act]." 33 U.S.C. § 1371(a)(2)(B). The Act gives the Secretary far-reaching control over various activities within navigable waters, but a claim for reimbursement of oil spill cleanup expenses would be brought by the Justice Department. The relation of that Refuse Act action to the WPCA would be governed by the more general "savings" provision that the WPCA "shall not be construed as . . . limiting the authority . . . of any officer or agency of the United States under any other law . . . not inconsistent with this chapter." 33 U.S.C. § 1371(a)(1).

 Full recovery of cleanup expenses as part of the remedy for a violation of the Refuse Act would be inconsistent with the WPCA. The Refuse Act is violated merely by the discharge of oil into navigable water without the permission of the Secretary of

the Army. *United States v. Standard Oil Co.*, 384 U.S. 224, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966). As analyzed above, full recovery upon a showing of such a low degree of culpability on the part of the defendant would violate the careful structure of the WPCA.

■ In reaching this conclusion, the court is mindful that two statutes should be harmoniously construed whenever possible. *Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974). It must be kept in mind, however, that the Refuse Act and the WPCA have been found to be incompatible on a narrow, isolated point—recovery of the full amount of the *actual costs* of cleaning up an oil spill. Claims under the Refuse Act for *damages to property* resulting from an oil spill, to the extent possible under that statute, remain viable, for the WPCA expressly provides that it shall not preclude any other claims for such damages. 33 U.S.C. § 1321(*o*)(1). Moreover, the court's conclusion here does not speak to the continued availability of injunctive relief against oil spillers under the Refuse Act. The granting of such relief was held to be not inconsistent with the WPCA in *United States v. Ira S. Bushey & Sons, Inc.*, 363 F.Supp. 110 (D.Vermont 1973).

*The WPCA and the plaintiff's non-statutory claims*

The United States' claim under the maritime tort law is one of negligence. Excepting only a passing allegation of willful misconduct, plaintiff's complaint presents a claim of "the negligence of defendant DIXIE, and the negligence of the M/V DIXIE BUCCANEER and the negligence of the T/B ABC 2311." Complaint, ¶ 19. Further, the cases plaintiff cites in support of its "maritime tort" theory speak in terms of ordinary negligence (or unseaworthiness, which does not apply here). *E. g. American Waterways Operators, Inc. v. Askew*, 335 F.Supp. 1241, 1247 (M.D.Fla.1971), *rev'd on other grounds* 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973) *reh'ing den'd* 412 U.S. 933, 93 S.Ct. 2476, 37 L.Ed.2d 162 (1973).

■ The United States' other non-statutory claim is one of public nuisance. For liability under that claim, "there need be no intent. . . . a public nuisance is 'an unreasonable interference with a right common to the general public.'" *United States v. Ira S. Bushey & Sons, Inc.*, 363 F.Supp. 110, 120 (D.Vermont 1973), quoting Restatement 2d Torts (Tentative Draft No. 17) § 821B(1).

■ Under each of these claims, then, a defendant could be held liable for the United States' full cleanup costs upon a showing of culpability less than the willful negligence or misconduct required by the WPCA for such liability. Accordingly, recovery under either theory would be "inconsistent" with the WPCA, 33 U.S.C. § 1371(a)(1), and thus cannot be pursued.

■ Of course, courts must be extremely hesitant to construe statutes in derogation of the common law or the general maritime law. *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783, 72 S.Ct. 1011, 1014–15, 96 L.Ed. 1294 (1952). However, any derogation here is, as noted above, on an extremely narrow and isolated point for which Congress has provided a specific statutory remedy. The viability of the maritime tort law or the federal common law of nuisance with respect to water pollution in all other ways is not affected by the court's conclusion here. Possible claims for damage to property based upon these laws remain, under the command of 35 U.S.C. § 1321(*o*)(1). Nor is this decision contrary to the Supreme Court's recent holding that injunctive relief against the discharge of pollutants is available under the federal common law of nuisance, consistent with the WPCA. *Illinois v. City of Milwaukee*, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972). In that case, the Supreme Court noted that the "remedy sought . . . is not within the precise scope of remedies prescribed by Congress." 406 U.S. at 103, 92 S.Ct. at 1392. Here, by contrast, the remedy is one that Congress has very precisely and deliberately fashioned.

*Cases on point*

The plaintiff and the defendants each refer the court to one case directly on point supporting their respective positions. I reach here the same result as that of *Complaint of Steuart Transportation Co.*, 435 F.Supp. 798 (E.D.Va.1977), although that court gave only the briefest statement of its reasoning. A contrary result was reached by Judge Heebe of this District in *United States v. M/V BIG SAM*, 454 F.Supp. 1144, 1978 A.M.C. 1341 (E.D.La.1978). I agree with Judge Heebe that, generally, the WPCA intends to co-exist peacefully with the Refuse Act. However, the WPCA's retention of the earlier statute is not unqualified, as was the case under the WQIA. On the narrow issue of the liability of vessel owners and operators for the full amount of the United States' oil spill cleanup expenses, I find that the statutes do conflict, and the Refuse Act must give way. Concerning the negligence issue, I agree with Judge Heebe that an action in maritime tort for damages resulting from an oil spill is expressly allowed by 33 U.S.C. § 1321($o$)(1). But the language of the WPCA distinguishes between an action for "actual costs incurred . . . for the removal of . . . oil," 33 U.S.C. § 1321(f)(1)–(3), and an action for "damages to any publicly owned or privately owned property," 33 U.S.C. § 1321($o$)(1). The WPCA "in no way touches" claims of the latter nature. *Askew v. American Waterways Operators, Inc.*, 411 U.S. 325, 333, 93 S.Ct. 1590, 1596, 36 L.Ed.2d 280 (1973). It is "restricted to cleanup costs," 411 U.S. at 336, 93 S.Ct. at 1597, but in that limited area its legislative program, to be effective, it must be exclusive.

For the foregoing reasons, the motion for partial summary judgment is DENIED in part and GRANTED in part, with all claims in the Complaint not based on the WPCA—what plaintiff calls its Second Cause of Action, its Third Cause of Action, and its Fourth Cause of Action—being dismissed.